**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| G. "J" D., by and through his Parents, | : | CIVIL ACTION |
| G.D. and M.D. | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| WISSAHICKON SCHOOL DISTRICT | : | NO. 10-1586 |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

**Baylson, J.**                                                    **June 14, 2011**

_____This case arises under the Individuals with Disabilities Education Act of 1997 ("IDEA"),

20 U.S.C. § 1400 et seq. (2005).  On June 16, 2009, the parents of G.D. or "Jack" ("Parents")

filed a due process complaint, contending that the Wissahickon School District ("District") had

failed to meet its Child Find obligations in violation of the IDEA and Chapter 14 of the

Pennsylvania Code, and Section 504 of the Rehabilitation Act ("Section 504") and Chapter 15 of

the Pennsylvania Code.  Parents contended that the District had failed to timely evaluate and

identify Jack as eligible for special education and denied him a free appropriate public education

("FAPE").  Parents sought compensatory education for the 2008-2009 school year and the 2009

extended school year.

On January 13, 2010, Deborah G. DeLauro, M.Ed, J.D., a Pennsylvania Special

Education Due Process Hearing Officer ("Hearing Officer"), issued a written decision, finding

that the District had denied Jack a free and appropriate education ("FAPE") in violation of IDEA

from April 3, 2009, through the end of the 2008-2009 school year.  The Hearing Officer awarded

-1-

Jack two hours of compensatory education per school day for that period during which Jack was found to have been denied a FAPE.

Parents did not appeal the decision, but filed a Complaint on April 9, 2010, seeking reasonable attorneys' fees and costs as the prevailing party in this matter, docketed under Civil Action Number 10-1586 (ECF No. 1). The District filed this appeal of the Hearing Officer's decision on April 13, 2010, docketed as Civil Action Number 10-1620 (ECF No. 1). These actions were consolidated under Civil Action Number 10-1586 by order on July 15, 2010 (ECF No. 3). Plaintiffs and Defendant have both filed motions for judgment in their favor (ECF Nos. 13, 14). Upon consideration of the parties' briefs, the administrative record, and the supplementary materials provided by the parties following this Court's January 21, 2011 hearing, the Court will affirm the decision by the Hearing Officer.

## I.      Factual History

_____Jack is a seven-year-old child who resides in the Wissahickon School District ("District"). Hearing Officer Decision at ¶ 1. Jack's parents ("Parents") enrolled Jack in the District's kindergarten at Blue Bell Elementary School at the start of the 2008-2009 school year. Jack has a history of aggressive behavior and has been diagnosed with a Sensory/Processing Disorder and attention deficit hyperactivity disorder ("ADHD"). Id. at ¶¶ 26, 28; School District Exs. 8, 12, Parents' Exs. 2, 21.

Before Jack began the school year, Jack's Parents provided Blue Bell's principal with (a) a Pre-Admission Screening Report, identifying Jack's verbal IQ at 143 and performance IQ at 103; (b) a private Occupational Therapy ("OT") evaluation, indicating behavioral and sensory issues; and (c) a second OT evaluation diagnosing Jack with a sensory processing disorder. Id. at

¶ 3-5; see School District Ex. 1, 2, 3. Parents also obtained an independent physical therapy ("PT") evaluation, which recommended weekly PT at home. Id. at ¶ 7. Parents also met individually with Jack's kindergarten teacher, Tishara O'Brien, and provided her with the reports. Id. at ¶ 9.

On July 25, 2008, the District issued a Permission to Evaluate ("PTE"), which the Parents signed and returned on September 16, 2008. Id. at ¶ 6; see Parents' Ex. 26; School District Ex. 5. On October 16, 2008, the District issued

1.    an Evaluation Report, which determined Jack not to qualify for PT services

2.    a Section 504/Chapter 15 service agreement, which provided Jack with accommodations, including OT, alternative seating, postural accommodations, and a plan to inform Jack of programs and behavioral expectations.

Hearing Officer Decision at ¶ 15; see School District Ex. 23. Parents did not sign and return the service agreement until December 3, 2008. Id. at ¶ 16.

On December 2, 2008, Ms. O'Brien issued Jack's first report card and indicated Jack was making academic progress, but that his behaviors were interfering with his learning, he was easily distracted, and had trouble with organization. Id. at ¶ 18; Parents' Ex. 11. The following day, Parent met with Ms. O'Brien to discuss behavior problems Parent had observed in Jack when Parent was visiting the classroom. Id. at ¶ 19. Ms. O'Brien discussed with Parent her strategies for addressing Jack's behavior, some of which had been successful, while others had not. Id. at ¶ 19-20. During December, Ms. O'Brien and Parents exchanged emails regarding Jack's increasingly problematic behaviors, including an incident in which Jack spit in a friend's face. Id. at ¶ 22; see Parents' Ex. 2; Tr. at 51. Soon after, Jack was referred for a Child Study

Team meeting.  Id. at 23.

On January 12, 2009, Parents met with District representatives, including Ms. O'Brien, the school principal, and the school psychologist, Gail Mallett.  Id. at ¶ 23; Parents' Exs. 2, 22. Parents expressed concern about Jack's behavior at home, but Ms. O'Brien had not found Jack's behaviors to have manifested in school at the same level of frequency or severity and assessed his behavior as "controllable."  Id. at ¶ 23; Tr. at 140-41; 311-12.  Ms. O'Brien also reported that Jack had made substantial progress academically and noted his remorse at the spitting incident. Id. at ¶ 24; Tr. at 141.

The District issued a second PTE on January 16, 2009, in order to conduct a multi-disciplinary evaluation.  Id. at ¶ 23; see School District Ex. 7.  Parents signed and returned the second PTE on February 4, 2009, having checked the box indicating that the evaluation was "to assist in [the] Functional Behavioral Process."  Id. at ¶ 27; see School District Exs. 9, 10.

On January 19, 2009, Parents engaged Childhood Solutions, P.C., to conduct a private psychological evaluation by Mara Kaplan-Kaliner.  Id. at ¶ 26.  The subsequent (undated) report diagnosed Jack with ADHD and recommended, inter alia, that Parents meet with the District to utilize a 504 accommodation plan to help Jack meet his academic and social potential.  Id. at ¶ 26; see School District Ex. 8; P Ex. 21.  Jack's private psychiatrist confirmed the ADHD diagnosis by letter on February 24, 2009 and prescribed medication.  Id. at ¶ 28; see School District Ex. 8.  Jack was given four different medications between February and June, 2009, due to adverse effects.  Id. at ¶ 29; P Ex. 2.

On March 23, 2009, Jack was sent to the principal because of an incident in which Jack "strangled" (in his words) or pushed (in Ms. O'Brien's words) another child because of his anger

about not having time to finish something.[1]  Id. at ¶ 33; see Parents' Exs. 11, 19.  He was

punished by missing a portion of that day's school celebration and had to write for his teacher the

reasons why he was missing the program.  Id.

Jack received his second report card on April 3, 2009.  Id. at ¶ 30; see P. Ex. 10.  Ms.

O'Brien noted, in her own handwriting, that Jack was "easily distracted.  Behavior interferes with

learning.  Behavior causes distraction to classmates."  Id.

Also on April 3, 2009, the District issued an Evaluation Report (the "Re-ER") based on a

psycho-educational evaluation conducted by Ms. Mallett.  Id. at ¶ 34; see School District Ex.

14.  Ms.  Mallett's evaluation included two in-class observations of one half hour and forty-five

minutes and input from Parents regarding Jack's needs, which they identified as attention issues,

sensory issues, easily distracted, over-stimulation, and some aggression.  Id.  Ms. Mallett also

obtained input from Ms. O'Brien regarding Jack's behavior and her classroom strategies to

address that behavior.  Id. at ¶ 35.  Ms. Mallett conducted aptitude and achievement testing on

the Weschler Intelligence Scale for Children, Fourth Edition ("WISC-IV"); Developmental

Neuropsychological Assessment ("NEPSY-II") testing; and Woodcock Johnson III Tests of

Cognitive Abilities, and incorporated findings from the Childhood Solutions report.  Id. at ¶ 36-

38 see School District Ex. 14.  Jack's scores on the Woodcock Johnson III Test were above his

age and grade equivalency and his academic skills fell within or above age and grade level in all

areas assessed.  Id. at ¶ 41-42; see School District Ex.  14 at 79-80; 86.  Jack's cognitive skills

were assessed at between high average and very superior ability.  Id.  Ms. Mallett concluded that

---

[1]Ms. O'Brien clarified in her testimony that Jack had grabbed and pushed another child
who was blocking his way and that Jack used the term "strangling" to describe the activity.
Hearing Officer Decision at ¶ 33 n. 13; Tr. at 412.

Jack was not eligible for special education services or an Individual Education Plan ("IEP"), although she acknowledged that Jack did "appear to be experiencing some significant additional concerns in the classroom and adaptions to his program should be implemented." Id. at ¶ 43; see School District Ex. 14 at 86.

Elaborating in cross examination at the due process hearing, Ms. Mallett testified at length that the discrepancies between a student's different IQ scores (i.e. between potential and performance) are not a major consideration for her in determining whether a child has a specific learning disability. Tr. at 218-235. Ms. Mallet also repeatedly characterized Jack's behavioral issues as isolated incidents and stated that the District does not "do IEPs for kids who have good skills to have better skills. We don't do an IEP for kids that have high average to superior skills. We don't do that." Id. at ¶ 44; Tr. at 234.

In her findings at the conclusion of the Re-ER, Ms. Mallett did recommend that Jack's 504 plan be continued and his behavior monitored. Id. at ¶ 45. Parents disagreed with the resulting Notice of Recommended Educational Placement ("NOREP") on April 8, 2009. Id. at ¶ 45; see School District Ex. 16.

On April 13, 2009, Parents received a report[2] from Dr. Sokoll, which built upon his prior findings of ADHD and motoric and visual/spatial deficits, determined that Jack met the criteria for a Non-Verbal Learning Disability ("NVLD"), and recommended placement in an "all day program in a self-contained classroom" with a teacher trained in special education. Id. at ¶ 49; see P Ex. 14. The report stated that Ms. Mallett's April 3, 2009 report "incorporate[d] Jack's

---

[2]The Parents did not provide the Sokoll Report to the District until filing the due process complaint on June 16, 2009. Hearing Officer Decision at ¶ 49 n.16; Tr. at 78, 79-80, 82.

evaluations incompletely and will need to incorporate this physician's evaluation and review with more care the statements made in writing by Jack's teacher." Parents' Ex. 14 at 10. The report also indicated some concern about the District's failure to recognize a need to provide services, regardless of Jack's high level of performance. Hearing Officer Decision at ¶ 50.

On April 16, 2009, Jack hit another student in the face. Id. at ¶ 51.

On April 22, 2009, at a school function, Ms. O'Brien and one of Jack's Parents discussed Jack's prior "eight days of phenomenal behavior." Tr. at 334. The next day, Jack had a very bad day in school. Tr. at 334. Ms. O'Brien testified that she called to inquire if something was wrong and the Parent disclosed that the Parents had taken Jack off medication because it was causing him difficulty sleeping. Tr. at 334-47.

On April 27, 2009, Parents met with Ms. Mallett and Ms. O'Brien. Hearing Officer Decision at ¶ 47. At that time, Ms. O'Brien commented to Parents that Jack "may be rolling around on the floor, but at least he's still answering the questions right." Id. at ¶ 47; Tr. at 71. In addition, Ms. Mallett responded to Parents' "unhappiness" with Ms. Mallett's noneligibility finding by asking "under [which] of the nine categories of an IEP do you think Jack would qualify? . . . it's not like he's blind." Id. at ¶ 48; Tr. at 71-72. After this meeting, the District revised the 504 Plan on April 27, 2009, to include recommendations from Ms. Mallett's report. Id. at ¶ 52; School District Ex. 25.

Throughout April and May, Ms. O'Brien noticed increases in the severity of Jack's behaviors, including his aggression towards other students, and new behaviors, such as a failure to express remorse and episodes of wailing and screaming. Id. at ¶ 53; Tr. at 176-77, 337, 340-41. As a result, the District issued a Third PTE on May 13, 2009, and conducted a functional

behavior assessment ("FBA") as a component of the evaluation.  Id. at ¶ 53; Tr. at 171.

On June 19, 2009, the District issued a Third ER, finding Jack's behavior to have "deteriorate[d] significantly," interfering with his learning and that of his classmates.  Id. at ¶ 54, 56; see School District Ex.  19, 20.  The evaluator determined Jack eligible for special education services under the category of "Other Health Impairment."  Id. at ¶ 55.[3]  On July 22, 2009, an IEP team convened and developed an IEP for Jack.  Id. at ¶ 57; School District Ex. 21.  Parents did not sign the corresponding NOREP.  Id. at ¶ 54; School District Ex. 22.

## II.      Procedural History

The Hearing Officer held two due process hearings, on September 14, and November 24, 2009.  Hearing Officer Decision at 2.  The Hearing Officer heard testimony from Jack's mother, Ms. O'Brien, and Ms. Mallett.  Id.

The Hearing Officer made a series of credibility determinations.  The Hearing Officer found Ms. O'Brien to be highly credible.  Id. at 14-15.  In contrast, the Hearing Officer found reason to doubt Parents' testimony, including their failure to sign Jack's first 504 Plan for almost two months, as well as their inconsistent testimony about Ms. O'Brien's effectiveness as a teacher and about the level to which Jack's behaviors escalated throughout the year.  Id. at 14 (citing School District Ex. 23; Tr. at 85-86; 107-108).[4]  Finally, the Hearing Officer found several aspects of Ms. Mallett's testimony brought her "credibility into question."  Id. at 13.  The

---

[3] The report states that "Jack underwent a circumstantial change in the form of a withdrawal of medication that he had been using to address ADHD symptomology [and h]is behavior changed dramatically[.]"  School District Ex. 20 at 14.

[4] The Hearing Officer did credit the testimony of Parents, who relayed Ms. O'Brien's comment that Jack "may be rolling around on the floor, but at least he's still answering the questions right."  Id. at ¶ 47; Tr. at 71.

Hearing Officer concluded, as well, that Ms. Mallett's findings "were based in large part on [Jack's] superior cognitive ability[,]" which the Officer stated was contrary to case law. Id. at 23.

The Hearing Officer found that the District provided positive supports for Jack early in the school year, but Jack's behavior had worsened by mid-December, resulting in a referral to the Child Study Team and, ultimately, a PTE for a multi-disciplinary evaluation. Hearing Officer Decision at 22. The Hearing Officer concluded that the District had met its Child Find obligation to Jack throughout the fall and early spring of 2009 and determined that the District had timely initiated the evaluation process that led to the April 3, 2009 Re-ER conducted by Ms. Mallett. Id. 19-22. However, the Hearing Officer determined the Re-ER had "significant flaws which resulted in an inappropriate evaluation." Id. at 26. Consistent with her credibility determinations, the Hearing Officer found that Ms. Mallett's findings overemphasized Jack's "superior cognitive ability." Id. at 23 (citing Tr. at 334). The Hearing Officer found further that the evaluation

1. did not assess "social emotional, behavioral or attentional areas of [Jack's] suspected disability" or analyze the affect of Jack's multiple diagnoses;

2. failed to ask whether Jack "exhibits behaviors that impede his learning or that of others[,]" a trigger for a FBA, which Ms. Ms. Mallett did not conduct;

3. minimized Jack's acknowledged behaviors; and

4. used flawed and insufficient analysis to determine if Jack has a Specific Learning Disability ("SLD").

Id. at 26-29. The Hearing Officer concluded that the deficiencies in the April assessment and failure to conduct an FBA until May 2009 resulted in a denial of FAPE for Jack between April 3, 2009, and June 16, 2009. Id. at 32.

The Hearing Officer issued the following decision dated January 13, 2010:

1.   The District did not fail Jack in its Child Find Obligation under the IDEA and Section 504.

2.   The District failed to provide Jack with a FAPE under the IDEA between April 3, 2009 through the end of the 2008-2009 school year.

3.   The District was required to provide Jack with two hours of compensatory education for each school day from April 3, 2009 through the end of the 2008-2009 school year.

Id. at 34.

## II.   **Legal Standards**

### A.   **Jurisdiction**

This action arises pursuant to the IDEA and Section 504 of the Rehabilitation Act of 1973.  This Court asserts jurisdiction under 20 U.S.C. § 1415(i)(3)(A) and 28 U.S.C. §§ 1331, 1343(a)(3).

### B.   **Standard of Review**

In an IDEA case, the Court exercises a modified de novo review, giving "due weight" to the findings of the Hearing Officer.  P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 734  (3d Cir. 2009).  The Court must consider such findings to be "prima facie correct" and must explain its reasons for declining to accept those findings.  S.H. v. State-Operated Sch. Dist., 336 F.3d 260, 271 (3d Cir. 2003).  The Court must defer to the credibility determinations of the Hearing Officer unless extrinsic evidence would justify a contrary conclusion, similar to a "clearly erroneous" standard of review.  Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004).  Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review."  Board of Education v. Rowley, 458 U.S. 176,

206 (1982).

## C.    IDEA

At its core, the IDEA[5] mandates that institutions receiving federal education funding supply all children with disabilities a "free and appropriate public education" ("FAPE").   20 U.S.C. § 1400(d)(1)(A); see e.g., P.P., 585 F.3d at 729.   "When parents challenge [the adequacy of] a school's provision of a [FAPE] to a child, a reviewing court must (1) consider whether the school district complied with the IDEA's procedural requirements and (2) determine whether the educational program was 'reasonably calculated to enable the child to receive educational benefits.'"  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 564 -565  (3d Cir. 2010) (quoting Mary T. v. Sch. Dist., 575 F.3d 235, 249 (3d Cir. 2009)).

A state must comply with the "Child Find" obligation of the IDEA,[1] which requires that a state have a system in place to identify, locate, and evaluate all potentially disabled children within the state.  Id. (citing 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)).   Once a state has identified and located a potentially disabled student, a "school district must conduct an evaluation of the student's needs, assessing all areas of suspected disability, before providing special education and related services to the child." P.P., 585 F.3d at 730 (citing 20 U.S.C. § 1414(b)).  Identification and evaluation of a child "suspected of having a qualified disability

---

[5]Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability by programs that receive federal funds.  Under Section 504, recipients of federal funds must "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).  The claims in this case made under Section 504 are parallel to the IDEA claims.

[1]Pennsylvania codifies its "Child Find" duties at 22 Pa. Code §§ 14.121-14.125 (2008).

[must occur] 'within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability.'" O.F. v. Chester Upland Sch. Dist., 246 F. Supp. 2d 409, 417 (E.D. Pa. 2002) (Buckwalter, J.) (citing W.B. v. Matula, 67 F.3d 484, 501 (3d Cir. 1995)). "Failure to locate and evaluate a potentially disabled child constitutes a denial of FAPE." N.G. v. District of Columbia, 556 F. Supp. 2d 11, 16 (D.D.C. 2008) (Sullivan, J.); see also O.F., 246 F. Supp. 2d at 417 ("[T]he clearest evidence of a denial of FAPE . . . is the length of time that [the district] took to evaluate [the child] and to develop an [Individualized Education Plan].").

Parents who believe that the implementation of the District's proposed plan "will not result in a FAPE for their child are entitled to an 'impartial due process hearing,'" presided over by a hearing officer. A.B. ex rel. Susan B. v. Montgomery County Intermediate Unit, 409 Fed. App'x 602, 603 (3d Cir. Jan. 11, 2011) (citing 20 U.S.C. § 1415(f)). A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district court, without regard to the amount in controversy. D.S., 602 F.3d at 558 (citing 20 U.S.C. § 1415(i)(2)).

III. **Parties' Contentions**

**A.    The District's Contentions**

The District contends, first, that Hearing Officer made flawed and inconsistent findings as to when the severity of Jack's behaviors increased and, therefore, incorrect conclusions as to Jack's eligibility for special education services. Def.'s Br. at 10-16.

Second, District contends that the Hearing Officer erred in ruling that the District denied FAPE and awarding compensatory education to Jack. Id. at 17-21. The District argues that the Hearing Officer's calculations regarding compensatory education were made without

explanation, were unsupported by the record, and relied on inapplicable legal support. Def.'s Br. at 21.

Third, District contends that the Hearing Officer's conclusions regarding the appropriateness of the April 2009 Re-ER were erroneous. Id. at 23-26. The District contends that the Hearing Officer was inaccurate in concluding that the District did not administer "social, emotional, behavioral or attentional" assessments in April 2009, as Ms. Mallett administered and considered a series of assessments. Id. at 23. District argues further that the Hearing Officer was incorrect to find the evaluation downplayed Jack's behaviors because the Re-ER was consistent with both the January 19, 2009 private psychological evaluation and Ms. O'Brien's testimony. Id. at 24-25.

Finally, District argues that Hearing Officer's relied inappropriately on the April 13, 2009 Sokoll report to corroborate Jack's ADHD diagnosis because the Parents (1) did not present Sokoll's testimony at the due process hearing or (2) supply the report to the District until mid-June 2009. Id. at 25-26.

## B.     The Parents' Contentions

The Parents respond that the Hearing Officer was correct to determine that District failed to appropriately evaluate Jack in April 2009 or timely offer him an IEP. Pl.'s Resp. at 7-22. The Parents argue Jack's behavior was problematic from the start of the school year, with concern from both the Parents and Ms. O'Brien increasing around December and receipt and confirmation of the ADHD diagnosis in January and February 2009, respectively. Id. at 7-12. In support, Plaintiffs point to Jack's progress reports and comments by Ms. O'Brien throughout the school year, documented incidents occurring from at least December 2009 going forward, and

new behaviors noticed by Ms. O'Brien in April 2009. Id. at 13-14, 20-21. Plaintiffs take particular issue with the District's focus on Jack's ability to "get the answers right" rather than on Jack's potential, stating that the District may not rely on passing grades as a measure of FAPE. Id. at 14-15.

The Parents contend that the Hearing Officer's assessment of the flaws inherent in the Re-ER was correct. Id. at 16-17. Plaintiffs also contend that the Hearing Officer properly considered the April 13, 2009 Sokoll evaluation, which they aver was sent to the District three months prior to the due process hearing. Id. at 14, 15 n.5. Finally, Plaintiffs contend that the Hearing Officer's calculations regarding compensatory education are supported by the case law. Id. at 22.

### C. The District's Reply

The District offers the following points in reply:

- Parents' failure to timely sign Jack's 504 Plan in Fall 2008 belies their testimony that they were alarmed about Jack's behavior throughout the school year.

- Parents rely incorrectly on the statement in Jack's progress report that his "Behavior interferes with learning" as Ms. O'Brien selected this from a "drop down menu" and the surrounding narrative comments suggest that Jack's behavior did not change until late in the school year.

- The Hearing Officer erred in concluding that the District's December 2008 decision to convene a Child Study Team was based on evidence that Jack was no longer responding the behavioral interventions, given that the request for a referral came from Parents.

## IV.    Discussion

### A.    Factual Findings of the Hearing Officer.

The District contends that (1) the Hearing Officer relied on only one event in characterizing Jack's behavior between March and April 3, 2009, as having "deteriorated further;" and (2) that the Hearing Officer relied on an erroneous finding that the District implemented a "new 'zero tolerance' plan" in response to Jack's behavior, thereby resulting in a flawed analysis  Def.'s Br. at 14.

This Court finds that the two statements cited by the District did not serve as the basis for the Hearing Officer's conclusion, but were part of an effort to summarize the bigger picture of a year's worth of demonstrated behaviors.  In fact, the Hearing Officer made specific findings regarding difficulties with Jack's behaviors prior to March, relying on (1) December 2, 2008 and April 3, 2009 progress reports from Ms. O'Brien stating that Jack's behavior interfered his ability and ability of others to learn, Hearing Officer Decision at ¶¶ 18, 30; Parents' Ex. 11, Tr. at 42-43, 183; Parents' Ex. 10 at 4, Tr. at 47, 381; (2) December 2008 emails between Ms. O'Brien and one Parent indicating that Jack's behaviors were worsening, Id. at ¶ 22; Tr. at 51; and (3) the December decision to call the Child Study Team and the January PTE citing the need for a multi-disciplinary evaluation, despite Ms. O'Brien's expressed view that Jack was continuing to make academic progress.  Id. at ¶¶ 23-25; Parents' Ex. 2, 22; School District Ex. 7; Tr. 140-41.  The Hearing Officer found further that evaluations from the private psychologist in January 2009, and a private psychiatrist in February, 2009 resulted in an ADHD diagnosis for Jack, indicating the severity of Jack's behavioral issues at that time.  Id. at ¶ 26; School District Ex. 8, Parents' Ex. 21, Tr. at 55); ¶ 28 (School District Ex. 8, School District Ex. 12, Parents' Ex. 2, Tr. at 58.  The

Court finds the Hearing Officer appropriately assessed witness credibility, made extensive factual findings, and decided consistently with those determinations.

As the District points out, the Hearing Officer also noted that Jack displayed some bad behaviors in March and early April, including a March 23, 2009 "strangling" or pushing incident for which Jack was punished by having to go to the principal rather than participate in school activities.[2]  Id.  ¶ 33; Parents' Ex. 19; NT62, 64, 412.   However, this finding was not determinative of the Hearing Officer's decision because her conclusion relied on evidence of ongoing issues, as opposed to a spike in behaviors during the March/early April time period.  The District argues that the relevant time period regarding Jack's behavior was his marked increase in inappropriate behavior starting in late April or May.  The Hearing Officer appropriately acknowledged the evidence of a "drastic change" in Jack's behavior starting in late April, id. at ¶¶ 32, 51, but that did not alter her conclusion that the District failed to take the appropriate steps in response to the earlier behavior.  These determinations are "due special weight,"  D.S. at 564 (citing Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 199).  As the findings of the Hearing Officer are supported by record evidence, the Court finds no error.

### B.     Denial of FAPE

Once a child has been evaluated and determined to be eligible under the statute, the school district "provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education Plan ("IEP"), which must be reasonably

---

[2] The Hearing Officer referred to this punishment as a "'zero tolerance' plan," which is not reflected in testimony by Ms. O'Brien or Ms. Mallet or the accompanying exhibits.  Hearing Officer Decision at 21.  However, even if the Hearing Officer was incorrect in characterizing Jack's punishment as such, the Court finds this to be harmless error.

calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." P.P., 585 F.3d at 729-30 (quoting Shore Reg'l High Sch. Bd. of Educ. 381 F.3d at 198) (internal quotation marks omitted). The district must "specially design[]" an educational program that meets a disabled child's "unique needs." D.S., 602 F.3d at 556 (citing Rowley, 458 U.S. at 188-89). While the IDEA does not mandate that the education received "maximizes the child's potential, [the state] must confer an education providing 'significant learning' and 'meaningful benefit,'" Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 390 (3d Cir. 1999) (quoting Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-84 (3d Cir. 1988))), "in light of the student's intellectual potential." Shore Reg'l High Sch. Bd. of Educ., 381 F.3d at 198 (quoting Polk, 853 F.2d at 181).

A Court may "consider [a child's] academic progress in evaluating the appropriateness of the IEP . . . in determining whether the original IEP was reasonably calculated to afford some educational benefit." D.S. 602 F.3d at 567 (citing Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993)). Nevertheless, the Third Circuit has recognized that a child's progress must be measured in light of that individual child's potential. See Ridgewood Bd. of Educ., 172 F.3d at 247 (citing Rowley, 458 U.S. at 202). "[W]hen students display considerable intellectual potential, IDEA requires 'a great deal more than a negligible benefit.'" Id. (quoting Polk, 853 F.2d at 182); see also Ringwood Bd. of Educ. v. K.H.J. ex rel. K.F.J., 258 Fed. App'x 399, 403 (3d Cir. 2007) (finding that a child with "above average" intelligence, who remained one- to two-years below grade level, had been denied an appropriate education).

      1.      **The Hearing Officer Did Not Err in Concluding that the District's Re-Evaluation was Inadequate.**

The District now challenges the Hearing Officer's determination that, while the District had met its Child Find obligation through its January PTE, the resulting April 3, 2009 Re-ER was inadequate  Id. at 23-26.  This Court finds that the Hearing Officer engaged in a thorough consideration of the evidence in her determination and that the record "read in its entirety [does not] compel a contrary conclusion."  S.H., 336 F.3d at 270.

First, the Court defers to the credibility determination made by the Hearing Officer that Ms. Mallett's finding of ineligibility was based in large part on her perceptions of Jack's cognitive abilities and potential for academic achievement.  Ms. Mallett's reluctance to see Jack's cognitive abilities in light of his behavioral issues is summed up by her initial impression, provided to Jack's parents at the January 12, 2009 CST meeting, that Jack was not eligible for services based on "his academic skills."  Tr. at 218-19; see also Tr. at 218-34.  She reinforced this view in her statements to Jack's Parents that Jack should not receive services because "it's not like he's blind" and in her testimony that "she didn't do IEPs for students who have good skills to have better skills."  Hearing Officer Decision at ¶ 48; Tr. at 71-72; Id. at 13, 23; Parents' Ex. 10; Tr. at 186-88, 334.

Second, this Court finds support in the record for the Hearing Officer's conclusion that in emphasizing Jack's cognitive abilities and progress, Ms. Mallett de-emphasized his problems. Ms. Mallett did consider a range of sources in her analysis including the January 19, 2009 private psychological evaluation, which included behavioral assessments and diagnosed Jack with ADHD and the Sensory Processing Disorder; parent and teacher rating scales which measured adaptive and problem behavior; and input from Ms. O'Brien on behavior.  School District Ex. 14. Yet, Ms. Mallett's findings refer in only a cursory manner to "some behavior and attentional

concerns" and "some significant attentional concerns within the classroom" and fail to incorporate any analysis regarding Jack's ADHD or Sensory Processing Disorder diagnoses. School District Ex. 14, p. 13-14. Furthermore, Ms. Mallett's findings regarding Jack's Behavioral Information do not appear to incorporate the clinical observations made by the occupational therapist, which indicate that Ms. O'Brien's behavioral interventions were not successful during the period observed. School District Ex. 14, p. 10, 14. Finally, as the Hearing Officer found, Ms. Mallett failed to incorporate her own classroom observations into the evaluation at all. Hearing Officer Decision at 13.

The Court also finds significant the fact that Ms. Mallett did not perform an FBA, despite indication from Jack's December progress report and communications between Ms. O'Brien and Jack's Parent that his behavior was impeding his progress, see Hearing Officer Decision at ¶ 18, Parents' Ex. 11, considerations that Ms. Mallett did not discuss at all in the Re-ER. Furthermore, the Re-ER included only limited analysis of the discrepancies between Jack's verbal IQ and his memory and processing speeds, as measured by Ms. Mallett on the WISC-IV.[3] See Hearing Officer Decision at ¶ 3; Tr. at 189-90.

The Court finds applicable the principle articulated by Judge Schiller in West Chester Area School Dist. v. Bruce C. that academic progress cannot serve as the sole "litmus test" for eligibility. 194 F. Supp. 2d 417, 421 (E.D. Pa. 2002) (citing Rowley, 458 U.S. at 203, n. 25) ("We do not hold today that every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education.'")).

---

[3] Ms. Mallett's Re-ER did not discuss Jack's Pre-Admission Screening Report that identified a 40-point discrepancy between Jack's verbal and his performance IQ, assessed prior to Jack's entering into kindergarten. See Hearing Officer Decision at ¶4; School District Ex.1.

Furthermore, the fact that Jack was able to achieve academically should have been measured in light of his "considerable intellectual potential." Ridgewood Bd. of Educ., 172 F.3d at 247.

Ms. Mallett and the District had an obligation to look beyond simply Jack's cognitive potential or academic progress and to address the attentional issues and behaviors that Ms. O'Brien had identified as impeding his progress. See Lauren P. v. Wissahickon Sch. Dist., 310 Fed App'x 552, 554-55 (3d Cir. 2009) (concluding that defendant's "failure to address [the child's] behavioral problems in a systematic and consistent way denied [her] a FAPE."); Neosho R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1029 (8th Cir. 2003) (concluding that, while student had made some progress, "any slight benefit was lost due to behavior problems that went unchecked" and unaddressed by the school district); Penn Trafford Sch. Dist. v. C.F., No. Civ. A. 04-1395, 2006 WL 840334, at *8 (W.D. Pa. March 28, 2006) (Conti, J.) (finding the failure to "provide a behavior management plan" through the IEP "a serious omission").

This Court concurs with the conclusions of the Hearing Officer that the District failed to properly evaluate Jack through the April 3, 2009 Re-ER. To find otherwise would be to substitute this Court's "notions of sound educational policy" for that of local school authorities. S.H., 336 F.3d at 270 (quoting MM v. Sch. Dist., 303 F.3d 523, 530–31 (4th Cir. 2002)).

### 2. The Hearing Officer did not err in concluding Jack was denied a FAPE.

The District further contends that the Hearing Officer erred in concluded Jack was denied a FAPE, arguing that the IDEA only requires a school environment in which child can "materially benefit," not one in which child thrives and that the Hearing Officer's own findings regarding Jack's academic progress even without an IEP support a contrary decision. Id. at 17-21. This Court disagrees with the District's contention that the Hearing Officer's findings

regarding Jack's academic progress are at odds with her finding of a denial of FAPE.

The District is correct that the Hearing Officer found Jack to have made "substantial progress in reading," acknowledged that Jack had been assessed at or above his age and grade level in all academic areas, and credited Ms. O'Brien's testimony that Jack "superseded expectations." Def.'s Br. at 18-19 (citing Hearing Officer Dec. at ¶ 24, 39, 42; Tr. at 317-20). Certainly Jack's cognitive abilities and academic progress were a relevant factor in his Re-ER and permissible for Ms. Mallett to consider. See D.S., 602 F.3d at 567. However, as addressed above, those factors should not be the beginning and end of the eligibility analysis. This Court concurs with the decision of the Hearing Officer that, had the District properly evaluated Jack in the April 3, 2009 Re-ER, there would have been no denial of a FAPE. As the District failed to convene the IEP team meeting and develop an IEP with a Positive Behavior Support Plan between April and July of 2009, the Court affirms the decision of the Hearing Officer that Jack was denied a FAPE for this period of time.

### C.    Compensatory Education

The Third Circuit has held that "the right to compensatory education accrues when the school knows or should know that its IEP is not providing an appropriate education." Ridgewood Bd. of Educ., 172 F.3d at 249 (citing M.C., 81 F.3d at 396). "Entitlement to [compensatory education does] not flow directly from Districts' failure to locate, identify and evaluate a potentially eligible student but rather from the deprivation of an appropriate education to a student who is or was in fact disabled under the IDEA." M.A. ex rel. E.S. v. Newark Public Schools, No. 01-3389, 2009 WL 4799291, at *15 (D.N.J. 2009) (Chesler, J.) (citing P.P., 585 F.3d 727) (holding that delay in providing child with evaluation could not, by itself, support

compensatory education claim without demonstration that child had been deprived of appropriate education)). Thus, even where a district engages in "egregious" delay prior to evaluating a child, if that child has not been denied an appropriate education during this period, the violation has been deemed purely procedural and a child is not entitled to compensatory education. P.P., 585 F.3d at 738 (determining no denial of FAPE because plaintiff child was enrolled in private school during the period of delay).

In this case, the Hearing Officer made a limited award of two hours of compensatory education for every day that Jack was denied a FAPE. The District contends that the Hearing Officer did not make adequate findings regarding her determination that Jack was entitled to compensatory education. This Court disagrees. According to Hearing Officer's findings, the District's was not a purely procedural violation. The Hearing Officer found that Ms. Mallett engaged in an inappropriate evaluation in April 2009 and, thus, did not determine Jack to be eligible for services under the IDEA until June 2009. As a result, Jack was not served by an IEP the period between April 3 and the end of the school year. Given the ongoing and escalating evidence of Jack's behavioral issues and Ms. Mallett's decision in April 2009 to afford impermissible weight to Jack's academic progress, this Court finds that the District knew or should have known that the Jack was not being provided with an appropriate education from the period between April 3, 2009, and the end of the 2008-2009 school year. The Court affirms the decision of the Hearing Officer that Jack is entitled to an award of limited compensatory education for that period of time.

"Parsing out the exact number of hours [a child] was not benefitted by FAPE during the time period 'would place an arduous and near impossible task upon the administrative bodies.'"

<u>Damian J. v. School Dist. of Philadelphia</u>, No. 06-3866, 2008 WL 191176, at *7 n.16 (E.D. Pa. 2008) (Sánchez, J.) (awarding full days of compensatory education) (quoting <u>Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.</u>, 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006)) (Jones, J.) (upholding an award of full days of compensatory education and rejecting the district's argument that the administrative decision did not contain an analysis of "how much and what type of compensatory education was appropriate"). This Court finds no need for the Hearing Officer to have made particularized findings to support the award granted and will not supplant that decision with its own.

##### C.     **Attorneys' fees**

Under the IDEA, this Court has the discretion to award the prevailing party reasonable attorney's fees. 20 U.S.C. § 1415(i)(3). The term "prevailing party" has the same meaning under the IDEA as it does in civil rights actions under 42 U.S.C. § 1988. <u>Bd. of Educ. v. Steven L.</u>, 89 F.3d 464, 468 (7th Cir. 1996). A plaintiff prevails in these actions "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the District's behavior in a way that directly benefits the plaintiff." <u>Farrar v. Hobby</u>, 506 U.S. 103, 111-12 (1992). This can occur either through a judgment on the merits, or through a settlement enforced by a consent decree. <u>Buckhannon Bd. & Care Home v. W. Va. Dep't of Health and Human Res.</u>, 532 U.S. 598, 604 (2001). It is clear to this Court that Plaintiffs are the prevailing party in this matter and eligible to recover reasonable attorneys' fees having obtained an award of compensatory education, and Plaintiffs may proceed pursuant to Fed. R. Civ. P. 54(d)(2).

## IV.     <u>Conclusion</u>

For the aforementioned reasons, this matter is resolved in favor of Plaintiffs and against

Defendants on all claims.  An appropriate order follows.


O:\CIVIL 09-10\10-1586 D v. Wissahickon\G.D. v. Wissahickon School Dist. 10-1586, MSJ Memorandum.wpd